UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**STONEBRIDGE AT GOLF VILLAGE
SQUARES CONDOMINIUM ASSOCIATION,**

    **Plaintiff,**

    v.

**PHOENIX INSURANCE COMPANY,**

    **Defendant.**

**Case No. 2:21-cv-4950
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter arises on Plaintiff Stonebridge at Golf Village Squares Condominium Association's ("Stonebridge") Motion to Compel Appraisal (ECF No. 16) and Motion for Leave to File Supplemental Authority (ECF No. 26). For the reasons stated herein, both motions are **GRANTED**, and this case shall be **STAYED** pending completion of a full appraisal.

**I.**

This insurance case, at base, gravitates around a single question: Whether Stonebridge, a condominium association, is entitled to an "impartial" appraisal of damages that its insurer preemptively refuses to cover. Ultimately, the Court finds it is. Of relevance are the following undisputed facts:

    **A. The Policy**

Stonebridge is a non-profit community association that represents a multi-building condominium complex in Powell, Ohio. Phoenix is a Connecticut-based insurance broker. In March 2019, Phoenix sold Stonebridge a one-year insurance policy—Policy No. 680-8M924178-19-42 (the "Policy")—which, starting in April 2019, obligated Phoenix to "pay for direct physical loss of or damage to" Stonebridge's buildings, subject to various limitations. (Pl.'s Ex. 1, ECF No.

1

17-2.) These "physical loss[es]" included those caused by "windstorm or hail." (*Id.* at PageID #177.)

Part of the Policy contained a $10,000 deductible for "Businessowners Property Coverage." (*Id.*) It also contained an appraisal provision which, in relevant part, provided either party the option to "make a written demand for an appraisal" if they ever disagreed on "the amount of loss" Stonebridge incurred. (*Id.* at PageID #166.) That demand, once made, triggered the following process:

> [E]ach party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property, the amount of Net Income and operating expense or the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

(*Id.*) This provision ended with a caveat, noting specifically that Phoenix "retaine[d] [its] right" to deny any claim Stonebridge made, even after an appraisal occurred. (*Id.*)

**B. The Claim**

On September 1, 2019, Stonebridge endured a large storm that allegedly damaged its buildings' roofs (the "September Storm"). It notified Phoenix of this "Loss" roughly a month-and-a-half later. In late November 2019, both parties simultaneously dispatched their own roofing contractors to inspect the Stonebridge property. (Pl.'s Ex. 3, ECF No. 17-4.) Eventually, Phoenix's contractor determined that "no hail damage to the roof shingles" occurred. (*Id.*) Stonebridge's contractor disagreed. (*Id.*) So, to bolster its own findings, Phoenix commissioned another contractor—HAAG Engineering ("HAAG")—to re-inspect the Stonebridge property.

Ultimately, HAAG "confirmed" that Stonebridge's roof shingles had not incurred any "hail damage." (*Id.*) It did, however, find "48 wind-damaged shingles on 16 of the 45 buildings." (*Id.*)

Later, in January 2020, "additional shingles" were reportedly blown off of Stonebridge's roofs. (*Id.*)

Based on HAAG's assessment, Phoenix estimated Stonebridge's total wind-related loss to be $4,157.04. (*Id.*) As that amount fell below the Policy's $10,000 deductible, Phoenix refused to provide coverage. (*Id.*) This prompted Stonebridge to retain an engineer of its own: Forensic Building Science, Inc. ("FBS"). Months thereafter, in June 2020, FBS submitted a forty-four-page report which (1) concluded that Stonebridge had, indeed, incurred "wind, hail and rain" damage from the September Storm, and (2) recommended "full replacement" of Stonebridge's "roof assembly." (Pl.'s Ex. 2, ECF No. 17-3.) In total, FBS estimated that this replacement project would cost $3,775,029.98. (Pl.'s Ex. 5, ECF No. 17-5.)

On February 1, 2021, Stonebridge formally demanded an appraisal under the Policy. Two weeks later, Phoenix "reject[ed]" that demand—at least "to the extent it" requested an appraisal for "hail damage" or "any damages not identified" by HAAG. (Pl.'s Ex. 3, ECF No. 17-4.) As Phoenix put, "[a]ppraisers only determine the amount of loss and do not resolve questions of coverage." (*Id.*) And as it had already determined, any hail damage that Stonebridge incurred fell "outside of the policy period"—meaning, in turn, that those damages were "beyond the scope of the appraisal clause." (*Id.*) So too, Phoenix reiterated, were "any damages not identified in the HAAG report." (*Id.*)

At the same time, Phoenix conceded it was "willing to submit" to a more limited appraisal—specifically, one cabined to the "covered damages [for] which there is a disagreement concerning the amount of the loss." (*Id.*) This, it noted, solely included the shingle damage that HAAG identified. (*Id.*) Months of back-and-forth ensued, with Stonebridge demanding a more comprehensive appraisal, and Phoenix standing put. Ultimately, this action followed.

3

**II.**

Stonebridge has brought a three-count suit grounded in two legal theories—(1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing—against Phoenix. (Compl., ECF No. 2 at ¶¶ 12-26.) Part of this suit also seeks a judicial declaration that "the appraisal panel" set forth in the Policy must "resolve the entire disputed amount of Loss," instead of the "Loss" Phoenix chooses to assess. To that end, Stonebridge now moves pursuant to O.R.C. § 2721.03 to "compel" such an appraisal, as well to stay litigation until that appraisal is complete. (ECF No. 16.) Separately, it moves for leave to submit one supplemental authority—our sister court's recent decision in *Westview Village v. State Farm Fire & Cas. Co.*, No. 1:22-cv-549, 2022 WL 3584263 (N.D. Ohio Aug. 22, 2022)—to support its motion. (ECF No. 27.) This latter, unopposed motion is **GRANTED**, and the Court will consider *Westview*—which is particularly on-point—in its analysis below.

**III.**

"Appraisal provides a mechanism to resolve disputes over amount of loss without litigation." *Westview*, 2022 WL 3584263, at *2. And in Ohio, parties may enforce appraisal provisions just as they can any other bargained-for contractual right. *See id.* (citing *Saba v. Homeland Ins. Co. of Am.*, 159 Ohio St. 237, 238, 112 N.E.2d 1 (1953)). Generally, appraisals are "binding as to the amount of loss." *Id.* (quoting *Prakash v. Allstate Ins. Co.*, 5:20-cv-524, 2021 WL 37698, at *2 (N.D. Ohio Jan. 5, 2021)). This factual issue—the "amount of loss"—is technically distinct from a coverage determination, which, by all accounts, is a "legal question" that a court must decide. *Id.*

Of course, "[s]eparating coverage issues from loss issues is not a simple task." *Id.* (citation omitted). That is why, out of precaution, "[p]arties sometimes agree to a policy that prohibits appraisers from answering causation questions when setting the amount of loss." *Id.* But where, as

4

here, an appraisal provision is otherwise silent as to how an appraiser should measure the "extent" of a "loss," courts in a variety of jurisdictions—including Ohio—have interpreted the process to "require[]" (or simply permit) a causation analysis. *Id.* at \*3-\*4; *see also Prakash*, 2021 WL 37698, at \*3; *TransCapital Bank v. Mercants Mut. Ins. Co.*, No. 3:11-cv-1176, 2013 WL 322156, at \*3 (N.D. Ohio Jan. 28, 2013) (finding that an appraisal umpire properly excluded certain "losses" from his award because he "evidently found there was insufficient proof" as to when those losses occurred); *Quade v. Secura Ins.*, 814 N.W.2d 703 (Minn. 2012) ("In sum, as an incidental step in the appraisal process in this case, the appraisers *must* necessarily determine the cause of the loss, as well as the amount necessary to repair the loss.") (emphasis added); *Hahn v. Allstate Ins. Co.*, 15 A.3d 1026, 1030 (R.I. 2011) (noting that a "dispute involv[ing] the extent of damages and the amount of loss . . . simply cannot be characterized as a scope-of-coverage issue," and that "the issue of causation and amount of loss are 'so inextricably intertwined that attempting to separate them in the event of genuine . . . disputes would frustrate the purpose" of Rhode Island's "appraisal statute").

That is what Stonebridge seeks here. As it notes, the real issue at play is *not* what constitutes a "covered event" under the Policy, but rather "the *extent* of damage that a covered event"—*i.e.*, the September Storm—actually "caused." *Id.* No part of the Policy, it asserts, prohibits an appraiser from answering that inquiry. And for Phoenix to suddenly assert otherwise, it argues, undermines the appraisal right it explicitly bargained for.

Phoenix disagrees. Pointing to *Saba* and this Court's decision in *Davis v. Geico Cas. Co.*, No. 2:19-cv-2477, 2020 WL 68573 (S.D. Ohio Jan. 7, 2020) (Smith, J.), it contends that the appraisal Stonebridge seeks is hardly required (or "mandatory"), given the Policy's statement that either party "*may*"—rather than "shall"—demand an appraisal in the event they disagree as to the

5

"amount of loss." In Phoenix's view, this "permissive" language excuses it from complying with Stonebridge's demand, as both parties here do not soly disagree on the "amount of loss," but *also* whether Stonebridge incurred any "roof 'damage' at all." (ECF No. 18 at PageID #420).

This argument lacks merit for several reasons. For one, it relies on a misreading of *Saba* and *Davis*. In *Saba*, the policy at issue specifically noted that, in the event both parties "fail[ed] to agree as to . . . the amount of the loss, then, on the written demand of *either*, *each shall* select a competent and disinterested appraiser[.]" *Saba* at 238 (emphasis in original). The Ohio Supreme Court construed this "simple and unambiguous" provision to mean that *either* party, on its own demand, could trigger the policy's full appraisal process. *Id.* at 239-41. Here, the Policy's appraisal provision contains virtually identical language. (*See* Pl.'s Ex. 1, ECF No. 17-2 at PageID #166) (stating that "in [the] event" (1) the parties "disagree" on the "amount of loss" and (2) "either" makes a "written demand for an appraisal of the loss . . . each party *will* select a competent and impartial appraiser," who "*will*," in turn, "select an umpire") (emphasis added). Phoenix does not acknowledge this, much less explain how this "inescapable language" makes the appraisal process it explicitly agreed to any less "mandatory" once a written demand is made. *Saba* at 243.

*Davis* does Phoenix no favors either. That decision—contrary to Phoenix's apparent stance otherwise—did not hold that an appraisal is merely "permissive" when its underlying policy acknowledges that a demand "may" be made. It simply held that an appraisal process did not need to occur *before* the plaintiffs brought suit.[1] *Davis*, 2020 WL 68573, at *3-*4. Certainly, that was the case here. That is, Stonebridge *could* have foregone its appraisal right and merely sued on its other legal theories. But it did not. And by formally demanding an appraisal, it obligated Phoenix

---

[1] This was a basis for GEICO's motion for dismissal—an important bit of context that Phoenix fails to mention in its Response to Stonebridge's motion. *See Davis*, 2020 WL 68573, at *3 ("GEICO . . . asserts that it is 'contractually entitled to have the appraisal process completed prior to suit on the policy.'")

6

to abide by the appraisal process that the Policy plainly spells out. To hold otherwise would be "equivalent to telling [Stonebridge] that, although [it] paid a premium for . . . the advantage of the appraisal provisions, [it] in fact received nothing therefor." *Saba* at 241.

Phoenix's position that "the extent of covered damage," is, in itself, a "coverage question" which must be resolved by this Court *before* an appraisal occurs fares no better. This, again, is for numerous reasons. For one, it misconstrues the "coverage question[s]" that courts generally resolve. As the *Westview* court aptly put, "[c]overage issues are contract-interpretation issues." *Westview*, 2022 WL 3584263 at *4. That is, they are "legal questions" which require courts to determine a given policy's "categories of coverage." *Id.* Here, there is simply no dispute regarding the types of "coverage" the Policy provides. Windstorm and hail damage unambiguously fall within its scope, and neither party argues otherwise. Nor is there any dispute "that a storm damaged [Stonebridge's] covered property." *Id.*; (Pl.'s Ex. 3, ECF No. 17-4) (noting Phoenix's estimate that Stonebridge suffered $4,157.04 in wind damage). There *is*, however, clearly a disagreement as to what damage, specifically, that storm caused. That is a factual inquiry, not a legal one. And it is a question that, in this Court's view, is best left for a full, first-hand appraisal, rather than a second-hand judicial review. *Westview*, 2022 WL 3584263 at *4 (finding that an "[a]ppraisal [was] the proper mechanism to resolve" a dispute over the "extent" of storm damage suffered by the claimant).

Phoenix, seeking to stave off this conclusion, finally argues that its scope of coverage must be resolved *now*, else it be "bound by an award . . . in excess of [its] legal liability." This argument is speculative at best, and overstated at worst. As *Westview* recognized, "[c]ourts that allow appraisal[s] to determine causation typically permit insurers to contest coverage and assert defenses *after* appraisers set the amount of loss." *Id.* at *4 (citation omitted). And indeed, here,

7

Phoenix has "retained" the right to do exactly that. (*See* Pl.'s Ex. 1, ECF No. 17-2 at PageID #166) ("If there is an appraisal, we will still retain our right to deny the claim."). That means it may seek to avoid liability (*i.e.*, by "contesting coverage" on the basis of causation) even after Stonebridge gets its appraisal. And to the extent Stonebridge seeks to challenge that maneuver as unlawful under the Policy, it may do so in this Court. This, as noted, is how the process is "generally intended" to work. *Quade*, 814 N.W.2d at 708 ("We emphasize that appraisal is a process that is generally intended to take place before suit is filed."); *see also Westview*, 2022 WL 3584263, at *2.

## IV.

For the foregoing reasons, the Court **GRANTS** Stonebridge's Motion to Compel Appraisal (ECF No. 16) and **STAYS** this litigation until a full appraisal occurs. The parties shall jointly file a short, one-page status report every **THIRTY (30) DAYS** until this appraisal is complete. Upon its completion, they shall promptly notify the Court as to whether any live dispute remains in this case.

This case shall be stayed.

**IT IS SO ORDERED.**

**9/22/2022**                                               **s/Edmund A. Sargus, Jr.**
**DATE**                                                       **EDMUND A. SARGUS, JR.**
                                                                **UNITED STATES DISTRICT JUDGE**